1

2

3

4

5

6

7                    **UNITED STATES DISTRICT COURT**

8                    **CENTRAL DISTRICT OF CALIFORNIA**

9

10  MARCY M. JACKSON,                )   NO. CV 04-02865 (Mc)
                                     )
11              Plaintiff,           )
                                     )   MEMORANDUM OF DECISION
12         v.                        )   AND ORDER IN A SOCIAL
                                     )   SECURITY CASE
13  JO ANNE B. BARNHART,             )
    Commissioner of the             )
14  Social Security Administration,  )
                                     )
15              Defendant.           )
    _____)
16

17       The plaintiff, MARCY M. JACKSON, filed the present action for

18  review of a final determination of the Commissioner of Social Security

19  (the "Commissioner") that the plaintiff is not disabled and not

20  entitled to supplemental security income ("SSI") disability benefits.

21  For the reasons set forth below, the court finds that the decision of

22  the Commissioner is not supported by substantial evidence.  The matter

23  is, therefore, remanded for further proceedings.

24                          **BACKGROUND**

25       The plaintiff protectively filed an application for SSI

26  disability benefits under the Social Security Act (the "Act") on

27  July 03, 2001. [Administrative Record ("AR") 42-44, 45.]  The

28  Commissioner denied the application initially and on reconsideration.

1 [AR 24-27, 30-33.]  At the plaintiff's request, an administrative

2 hearing was held before Administrative Law Judge F. Keith Varni (the

3 "ALJ") on December 9, 2002. [AR 223-49.]  On December 20, 2002, the

4 ALJ filed a decision concluding that the plaintiff was not under a

5 disability as defined in the Act at any time through the date of the

6 decision. [AR 14-20.]  The Appeals Council denied the plaintiff's

7 request for review of the ALJ's decision. [AR 4-6.]  The decision of

8 the ALJ stands as the final decision of the Commissioner.

9        Thereafter, the plaintiff filed the present action.  The

10 plaintiff and the Commissioner have consented to proceed before a

11 United States Magistrate Judge.  The parties have entered into a Joint

12 Stipulation setting forth their arguments.

13                          **STANDARDS OF REVIEW**

14        The court must sustain the findings of the Commissioner unless:

15 (a) they are not supported by substantial evidence in the record as a

16 whole; or (b) the Commissioner applied an improper legal standard.

17 See 42 U.S.C. 405(g); Gordon v. Secretary of Health and Human

18 Services, 803 F.2d 1071, 1072 (9th Cir. 1986).  Substantial evidence

19 means "more than a mere scintilla" but less than a preponderance.

20 Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28

21 L.Ed.2d 842 (1971); Desrosiers v. Secretary of Health and Human

22 Services, 846 F.2d 573, 576 (9th Cir. 1988).  "Substantial evidence"

23 is evidence a "reasonable mind might accept as adequate to support a

24 conclusion."  Richardson v. Perales, 402 U.S. at 402; Gordon v.

25 Secretary of Health and Human Services, 803 F.2d at 1072.

26        This court must review the record as a whole and consider adverse

27 as well as supporting evidence.  See Green v. Heckler, 803 F.2d 528,

28 529-30 (9th Cir. 1986).  Where evidence is susceptible of more than

1  one rational interpretation, the court must sustain the Commissioner's
2  decision.  <u>See</u> <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1453 (9th Cir.
3  1984).

4  ### THE FIVE-STEP SEQUENTIAL EVALUATION

5      The Commissioner has established a five-step sequential
6  evaluation for determining whether a person is disabled.  First, the
7  Commissioner determines whether the person is engaged in "substantial
8  gainful activity."  If so, the Commissioner denies disability
9  benefits.  Second, if the person is not so engaged, the Commissioner
10  determines whether the person has a medically severe impairment or
11  combination of impairments.  If the person does not have a severe
12  impairment or combination of impairments, the Commissioner denies
13  benefits.  Third, if the person has a severe impairment, the
14  Commissioner determines whether the impairment meets or equals one of
15  a number of "listed impairments."  If the impairment meets or equals a
16  "listed impairment," the Commissioner conclusively presumes that the
17  person is disabled.  Fourth, if the impairment does not meet or equal
18  the "listed impairments," the Commissioner determines whether the
19  impairment prevents the person from performing past relevant work.  If
20  the person can perform past relevant work, the Commissioner denies
21  benefits.  Fifth, if the person cannot perform past relevant work, the
22  burden shifts to the Commissioner to show that the person is able to
23  perform other kinds of work.  The person is entitled to disability
24  benefits only if he or she is unable to perform other work.  See 20
25  C.F.R. § 404.1520 and 20 C.F.R. § 416.920; <u>Bowen v. Yuckert</u>, 482 U.S.
26  137, 140-42, 107 S.Ct. 2287, 96 L.Ed 119 (1987).
27  \\\
28  \\\

**<u>FINDINGS OF THE ALJ</u>**

The plaintiff was born June 26, 1952. [AR 42.]  The plaintiff has "more than a high school education' [AR 15, 59] and past relevant work experience as a certified nurse assistant and school cafeteria server [AR 15; AR 66].  The plaintiff alleged that she has been unable to work since January 17, 1999, because of right arm pain.  [AR 55.]  The plaintiff also complains of pain in her left arm, neck, low back, bilateral shoulders, bilateral elbows, bilateral wrists, bilateral hands, and bilateral knees [AR 132-33] as well as her ankles and feet [AR 170].  Additionally, the plaintiff alleges a mental impairment.

The ALJ found that the plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.  The ALJ found that the plaintiff had "questionably severe impairment of the musculoskeletal system" [AR 19] and a non-severe mental impairment [AR 18].  The ALJ further found that the plaintiff did not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1, Subpart P, Regulations No. 4. [AR 19.] The ALJ found that the plaintiff was not totally credible and that the plaintiff retained the residual functional capacity to perform "at the very least" medium work.  More specifically, the ALJ found that the plaintiff could lift and carry up to fifty pounds occasionally and twenty five pounds frequently, and that she could stand and/or walk six hours, and sit six hours in an eight-hour day.  The ALJ further found that the plaintiff was precluded from prolonged or continuous fingering activities and that she should avoid concentrated exposure to environmental factors of extreme heat and cold, wetness, humidity, noise, vibration, fumes, odors, dusts, gasses, and working around hazardous machinery and heights. [AR 19-20.]  The ALJ found that the

1  plaintiff's past relevant work as a certified nurse's assistant and

2  school cafeteria server did not require the performance of work-

3  related activities precluded by her residual functional capacity.

4  Accordingly, the ALJ concluded that the plaintiff was capable of

5  performing her past relevant work and that she was not under a

6  disability as defined in the Act at any time through the date of his

7  decision. [AR 20.]

8                    **THE PLAINTIFF'S CONTENTIONS**

9       The plaintiff contends that the ALJ erred in finding that her

10  mental impairment was non-severe; that the ALJ erred in assessing the

11  plaintiff's physical residual functional capacity; and that the ALJ

12  erred in rejecting the plaintiff's testimony.

13                         **DISCUSSION**

14  **The ALJ's credibility assessment**

15       Where the plaintiff has established the existence of a medically

16  determinable impairment which may reasonably account for the symptoms

17  alleged, although not necessarily the degree alleged, the ALJ must, in

18  the absence of affirmative evidence of malingering, cite clear and

19  convincing reasons for disbelieving subjective allegations. <u>Batson v.</u>

20  <u>Commissioner of the Social Security Administration</u>, 359 F.3d 1190,

21  1196 (9th Cir. 2004).

22       Although not all of the ALJ's credibility findings are

23  sufficient,[1] nevertheless, the ALJ cited clear and convincing reasons

24  _____

25       [1]For example, the ALJ found that the plaintiff has had minimal
    routine conservative care. [AR 16.] However, the record reflects that
26  the plaintiff was prescribed significant pain medication by multiple
    sources.  In July, 2000, the plaintiff took Tylenol with codeine. {AR
27  119.] The plaintiff reported that in November, 2001, she continued to
    take Tylenol with codeine apparently simultaneously prescribed by a
28  physician at Loma Linda and by Dr. Archie Mays at Cornerstone Medical

1  for finding the plaintiff not totally credible.   The ALJ noted the

2  lack of objective findings.  He noted that an MRI of the cervical

3  spine taken in October, 1999, was within normal limits with only a one

4  to two millimeter disc bulge versus endplate ridging at C6-7 [AR 16;

5  AR 117].  The ALJ also cited the plaintiff's MRI of the lumbar spine

6  which also revealed normal findings. [AR 16; AR 124.] An MRI of the

7  right shoulder was also essentially within normal limits, despite the

8  technologist's noting that the plaintiff was in a lot of pain. [AR 16;

9  AR 114.] The ALJ observed that Dr. Green reported that "'objective

10  factors are few and far between in this case.'" [AR 16; AR 158.] In

11  fact, Dr. Green commented that "[a]s a matter of fact, Ms. Jackson's

12  cervical and lumbar spinal x-rays are remarkably benign for a woman of

13  her age." [AR 158.] Accordingly, the ALJ found that the plaintiff's

14  own assessment of her limitations was "greatly exaggerated" and

15  "unsupported by documented pathology." [AR 19.]  Although the lack of

16  objective findings to correlate with the severity of subjective

17  complaints cannot be the sole reason for finding the plaintiff not

18  credible, it is, nevertheless, one of the valid considerations.

19  Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991).

20       The ALJ also noted the references in the record suggesting that

21  the plaintiff exaggerated her symptoms. [AR 16, 17.] For example, the

22

23  Group.  The plaintiff was also prescribed Vicodin by Cornerstone [AR
    62] and by Kaiser Permanente as well [AR 167].  (The Kaiser
24  prescription, dated September 1, 2001, is for a "Marcy Campbell," a
    name not listed as one previously used by the plaintiff. [AR 42.]
25  However, the Kaiser patient number on the prescription is identical to
    the one identified by the plaintiff as hers. [AR 94, 167.]) At least
26  beginning in March, 2002, the plaintiff began receiving morphine-based
    medication [AR 223, 225] which she was continuing to take at the time
27  of the hearing [AR 243]. In June, 2002, the plaintiff was also
    prescribed Tylenol with codeine. [AR 221; see AR 100.]  The use of
28  such medication does not suggest routine conservative treatment.

ALJ cited Dr. Green's observation that the plaintiff's "'professed pain on squatting . . . was not borne out by other activities.'" [AR 16, 158.] The ALJ also noted that the consultative examiner, Dr. Laurence Meltzer, reported that the plaintiff "'markedly exaggerated her symptoms.'" [AR 17; AR 170, 175.]  Dr. Meltzer reported that the plaintiff refused to squeeze the Jamar dynamometer.  Dr. Meltzer also indicated that the plaintiff stated that she was unable to squeeze Dr. Meltzer's fingers, yet there was no evidence of atrophy in either extremity.  Therefore, the ALJ's conclusion that there was evidence of exaggeration is supported by the record. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148 (9th Cir. 2001)(The ALJ's credibility finding that Tonaypetyan exaggerated her symptoms was supported by the observations of the consultative examiners).

**<u>The plaintiff's mental impairment</u>**

        The plaintiff contends that the ALJ erred in finding a non-severe mental impairment.  A non-severe mental impairment is defined in 20 C.F.R. § 416.921 as an impairment or combination of impairments which does not significantly affect an individual's ability to perform basic work activities.  Examples of basic mental work activities include the ability to understand, remember and carry out simple instructions, use judgment, respond appropriately to supervision, co-workers and usual work situations, and deal with changes in a routine-work setting.

        The plaintiff relies upon the assessment of Dr. H. N. Hurwitz, the State agency physician who found that the plaintiff's mental impairment was "severe," and upon the evaluation of the consultative psychologist, Clifford Taylor, Ph.D. [See AR 197; 178-84.] The

\\\

\\\

- 7 -

plaintiff contends that the ALJ failed to provide clear and convincing reasons for rejecting the uncontroverted opinions of Drs. Hurwitz and Taylor.

However, the opinion of Dr. Hurwitz, a non-examining physician, without more, cannot constitute substantial evidence.  It is substantial evidence only to the extent that it is not contradicted by all other evidence in the record and is consistent with it.  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1042 (9th Cir. 1995).  In the plaintiff's case, other than a prescription for Prozac [AR 222] and a referral for psychiatric treatment in March, 2002 [AR 224], there is no other record of psychiatric treatment or evaluation except the report of Dr. Taylor, whose opinion would generally be entitled to greater weight than the opinions of a non-examining physician such as Dr. Hurwitz. <u>Id.</u>, at 1041.

The defendant argues that Dr. Taylor's report supports the ALJ's conclusion that the plaintiff did not have a severe impairment despite the findings of both Dr. Hurwitz and Dr. Taylor that the plaintiff suffered from borderline intellectual functioning. The evidence concerning the plaintiff's intellectual functioning, however, is somewhat contradictory, in which case, it is for the ALJ to resolve the conflict.  <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982).

As noted by the defendant, low I.Q. scores notwithstanding,[2] Dr. Taylor's mental status examination revealed that the plaintiff's

_____

[2]The plaintiff was administered the Wechsler Adult Intelligence Scale and was found to have a verbal I.Q. of 60, a performance I.Q. of 75, and a full scale I.Q. of 63. According to Dr. Taylor, overall intellectual functioning was assessed to be extremely low.  However, these scores "appear to under-reflect her current educational level and was probably affected [by] her level of pain, depression, cultural factors and English as the second language." [AR 183.]

1  intelligence was estimated to be in the average range.  Attention and

2  concentration were likewise normal.  The plaintiff had normal

3  immediate concentration and memory.  "She could adequately maintain

4  focus and resist distractions.  She gave adequate persistence.  She

5  was able to follow directions without difficulty and without

6  repetition." Insight and judgment appeared intact and "reasoning

7  abilities were essentially intact in that she could identify and

8  understand prosocial behavior."  Speech was normal, and the plaintiff

9  did not report any problems with comprehension.  Immediate auditory

10  memory was normal and sustained concentration and recent memory were

11  slightly below normal.  Long term memory was intact. [AR 181.]

12  _____Dr. Taylor concluded that the plaintiff's ability to understand,

13  remember, and carry out job instructions appeared normal.  "She

14  performed capably on tasks that required sustained concentration.  She

15  could focus on instructions and follow directions."  Dr. Taylor

16  assessed that the plaintiff's ability to maintain attention,

17  concentration, persistence and pace was mildly impaired due to

18  depression and pain sequelae.  "In general, she performed adequately

19  on measures of sustained concentration . . . ."  Dr. Taylor further

20  opined that "[f]rom a cognitive and psychological standpoint, [the

21  plaintiff] can complete simple and repetitive tasks without any

22  difficulty," although the plaintiff's "ability to work without

23  difficulty on sustained bases may be impaired due to her medical

24  conditions, but a specialist should address this issue." [AR 184.]

25      Dr. Taylor also assessed that the plaintiff's "ability to relate

26  and interact with supervisors, coworkers and the public appeared only

27  mildly impaired based on her current mood quality, attitude,

28  willingness to follow instructions and cooperation during this contact

period." The plaintiff's "ability to adapt to day-to-day work activities, including attendance and safety, appeared normal based on her current mental status and presentation."   [AR 184.]

Thus, despite the plaintiff's low I.Q. scores, Dr. Taylor's findings and assessments would ordinarily be considered as supporting the ALJ's conclusion of a non-severe mental impairment–namely that the plaintiff does not have any significant limitation in her ability to perform basic work activities such as understanding, remembering and carrying out simple instructions [AR 181, 184]; using judgment [AR 181]; responding appropriately to supervision, co-workers and usual work situations [AR 184]; and dealing with changes in a routine-work setting [see AR 184]. 20 C.F.R. § 416.921.

_____This being said, however, the ALJ's assessment of the plaintiff's mental limitations is not free of legal error, because where there are multiple impairments, even limitations arising from a non-severe impairment must be considered in the residual functional capacity assessment.  20 C.F.R. § 416.945(a)(2)(If a claimant has more than one impairment, the Commissioner will consider all of her medically determinable impairments, including those medically determinable impairments which are not "severe," in assessing residual functional capacity).  Thus, it is insufficient for the ALJ to dispose of the plaintiff's mental limitations by merely stating that there was "no basis for finding that the claimant has a 'severe' mental impairment or for the imposition of any mental limitations that would preclude the performance of simple, unskilled work activities." [AR 18.]

\ \ \

\ \ \

\ \ \

This is particularly true when the ALJ himself suggests that the plaintiff may be limited to simple, unskilled tasks[3], in which case, the plaintiff would likely be precluded from her past relevant work as a certified nurse assistant, which is not unskilled work.[4]   (<u>Infra</u>.) <u>See</u> SSR 85-28 ("If the medical evidence establishes only a slight abnormality(ies) which has no more than a minimal effect on a claimant's ability to do basic work activities, but evidence shows that the person cannot perform his or her past relevant work because of the unique features of that work, a denial at the 'not severe' step of the sequential evaluation process is inappropriate. The inability to perform past relevant work in such instances warrants further evaluation of the individual's ability to do other work considering age, education and work experience").

\\\

---

[3]Dr. Taylor's assessment is somewhat equivocal in this regard. On the one hand, Dr. Taylor indicted that "[t]he applicant's ability to understand, remember, and carry out job instructions appeared normal as evidenced by her performance on the mental status examination and the WAIS-III."  Dr. Taylor did not qualify this to mean only simple work.  On the other hand, Dr. Taylor also indicated that "[f]rom a cognitive and psychological standpoint, she can complete simple and repetitive tasks without any difficulty." [AR 184.] The ALJ's assessment is likewise unclear.  To say that the plaintiff has no mental limitations which "would preclude the performance of simple, unskilled work activities" is not to say that the plaintiff is limited to simple, unskilled work activities. [AR 18.]

[4]Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. . . . For example, [the Commissioner] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing . . ., or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed."  20 C.F.R. § 416.968(a).  <u>See</u> <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1276 (9th Cir. 1990).  The certified nurse assistant job carries an SVP of 4, which requires over three months up to six months of vocational preparation.  D.O.T. 355-674-014.

1    Thus, the Commissioner must consider the plaintiff's mental
2    limitations, regardless of severity, at step four and at step five.
3    **The plaintiff's past relevant work**

4    _____ Couched in terms of whether the ALJ erred in assessing the
5    plaintiff's physical limitations, the plaintiff argues that the ALJ's
6    finding that she could return to her past relevant work is not based
7    upon substantial evidence.

8    The plaintiff's job as a certified nurse assistant

9    The plaintiff's first argument concerns the plaintiff's fingering
10   limitations.  The plaintiff notes that in citing the plaintiff's
11   subjective complaints, Dr. Green found that the plaintiff would have
12   moderate pain with <u>frequent</u> or constant fingering activities. [Joint
13   Stipulation at 14; AR 157.] However, in enumerating the plaintiff's
14   work limitations due to her right hand pain, Dr. Green changed the
15   wording slightly, precluding the plaintiff from "<u>prolonged</u> or
16   continuous fingering activities."  (Emphasis added.) [AR 158.]

17   The plaintiff argues that "moderate" pain under California
18   workers' compensation definitions means pain that would cause a marked
19   handicap in the activities precipitating the pain. 8 Cal. Code of
20   Regulations § 9727. Therefore, according to the plaintiff, she would
21   have pain that would markedly interfere with <u>frequent</u> fingering.
22   [Joint Stipulation at 14.] The plaintiff contends that "the ALJ did
23   not properly address the opinions and ramifications of the opinions of
24   Dr. Green," and that, therefore, the ALJ committed error.  The
25   plaintiff believes that, if the ALJ had considered Dr. Green's
26   assessment of the plaintiff's subjective limitations–i.e., that she
27   would have a marked handicap in performing frequent fingering–the ALJ
28   could not have found that the plaintiff could return to her past

- 12 -

1  relevant work as a nurse assistant, which, according to the D.O.T.
2  requires frequent fingering.

3      The D.O.T. definition of "frequent" is that the activity occurs
4  one-third to two-thirds of the time.  D.O.T. 355.674-014.
5  The plaintiff argues that the workers' compensation definition of
6  "frequent" encompasses activities performed from fifty per cent of the
7  time to seventy-five per cent of the time. Therefore, according to the
8  plaintiff, the Social Security and workers' compensation definitions
9  are essentially parallel.  [Joint Stipulation at 14.]

10      However, the plaintiff's attempts to fit Dr. Green's assessment
11  of her subjective complaints into the Social Security description of
12  "frequent" is unpersuasive.

13      First, the workers' compensation definition of the word
14  "frequent" is not from fifty to seventy-five per cent of the time.
15  The workers' compensation definition of "frequent" means "75%" of the
16  time [Schedule for Rating Permanent Disabilities, 1-7] or
17  "approximately 75% of the time" [8 Cal. Code of Regulations, § 37,
18  Treating Physician's Determination of Medical Issues Form].
19  "Constant" means "90-100%" of the time.  "Intermittent" means "50%" of
20  the time, and "occasional" means "25%" of the time.

21      There is no set definition for "two-thirds"[5] of the time under
22  the workers' compensation definition.  However, Dr. Green's assessment
23  that the plaintiff would have "moderate" pain with "very frequent
24  (emphasis added) or constant" fingering suggests that the pain would
25  rise to the level of moderate as the level of activity approaches

26
27      [5]The plaintiff essentially ignores the fact that the Social
    Security definition of "frequent" could also apply to activities
    occurring only thirty-four per cent of the time, a much lower
28  percentage of time than "approximately 75%".

constant.  Dr. Green could have just as well found that the plaintiff had "moderate" pain with intermittent to frequent fingering for activities performed between fifty to sixty-seven per cent of the time, which more closely corresponds with the Social Security definition of "frequent."  However, he did not do so, and it is clear from the body of his report that Dr. Green recognized the "nonorganic" features of the plaintiff's examination, noting for example, that the plaintiff stated that her forearm was swollen when in fact it was not. To the contrary, Dr. Green found that "the muscles are soft with no evidence of inflammation, doughiness, or any other structural abnormalities." [AR 156.] Thus, the interpretation that Dr. Green's assessment of moderate pain applied to activities performed closer to seventy five per cent of the time and greater is a reasonable interpretation.  The ALJ, therefore, did not reject Dr. Green's assessment but rather interpreted it.  <u>Orteza v. Shalala</u>, 50 F.3d 748, 750 (9th Cir. 1995).

The opinion of the State agency physician, Dr. James A. Haaland, upon whom the ALJ primarily relied [AR 20], was consistent with Dr. Green's assessment of the plaintiff's subjective complaints, indicating as Dr. Haaland did that fingering was "limited to fourty [sic] five minutes of each hour with short 2-3 minute breaks as necessary for stretching" [AR 190]. Since the job of certified nurse assistant does not require fingering approximately seventy-five per cent of the time, the plaintiff was not precluded from performing this job by reason of any fingering limitations.

As part of the plaintiff's argument concerning her mental limitations, the plaintiff argues that the job of certified nurse assistant is beyond her mental limitations.  First, the plaintiff

argues that Dr. Hurwitz' assessment that the plaintiff was prohibited from working with the public, precluded the performance of the nurse assistant job. [Joint Stipulation at 6.] However, Dr. Hurwitz did not preclude the plaintiff from working with the public [AR 212], and Dr. Taylor indicated that the plaintiff's ability to deal with supervisors, coworkers and the public appeared only mildly limited [AR 184].

Also as part of her arguments concerning her mental impairment, the plaintiff contends that work as a certified nurse assistant requires a reasoning level of 3 which involves more than simple work activities. [Joint Stipulation at 6.] The D.O.T. definition of reasoning level 3 suggests that the plaintiff's argument might have merit if, in fact, the plaintiff is limited to simple work.  In any event, if the plaintiff is limited to simple unskilled work (<u>supra</u>), the plaintiff would be precluded from the certified nurse assistant job by virtue of the fact that this job is not unskilled.

Accordingly, remand is required for the ALJ to determine the plaintiff's mental residual functional capacity, "severity" notwithstanding, and then to reassess the plaintiff's ability to perform the job of certified nurse assistant.  A vocational expert should be called.

<u>The plaintiff's job as a cafeteria worker</u>

One of the plaintiff's arguments is that "[a] substantial question exists on this record whether Marcy Jackson earned more than $500 per month in 1998 and 1999 as a cafeteria worker."  The plaintiff suggests that because her work as a cafeteria worker was part time, her earnings may not have reached presumed substantial gainful activity levels.  The plaintiff argues that if this work is not

1  substantial gainful activity, it cannot qualify as past relevant work.

2  [Joint Stipulation at 14, n. 3.]

3      In order for work to be considered past relevant work, it must be

4  substantial gainful activity.  20 C.F.R. § 416.960(b)(1).

5  "Substantial gainful activity is work activity that is both

6  substantial and gainful."  It "is work activity that involves doing

7  significant physical or mental activities."  "[W]ork may be

8  substantial even if it is done on a part-time basis...."  Work is

9  gainful if it is done for pay or profit or is the kind of work usually

10  done for pay or profit, regardless of whether profit is realized.  20

11  C.F.R. § 416.972.

12      In evaluating whether work activity is substantial gainful

13  activity, earnings are considered.  An individual working as an

14  employee who earned more than $500 a month is generally presumed to

15  have engaged in substantial gainful activity.  Earnings equal to or

16  below $300 a month, however, are generally considered to be below

17  substantial gainful activity levels. 20 C.F.R. § 416.974(b)(2)and (3).

18      The plaintiff testified that she worked in the food service

19  department for the Fontana School District for eleven years. [AR 235-

20  36.] The plaintiff testified that she worked only an hour or two every

21  day.[6] [AR 236.] In the forms which the plaintiff completed in

22  connection with her application, the plaintiff indicated that she

23  worked two [AR 56] or three [AR 74] hours per day, earning $9.75 per

24  hour [AR 56, 74].  The plaintiff acknowledges that at three hours per

25   day and at $9.75 per hour, the plaintiff would have earned $633.75

26  _____

27      [6]Although the defendant argues that the plaintiff failed at the
    hearing to raise the issue of whether her job at the Fontana School
28  District was substantial gainful activity, clearly the issue has been
    raised by the plaintiff herself by virtue of this testimony. [AR 236.]

per month, above the presumed substantial gainful activity amount. [Joint Stipulation at 14, n. 3.] However, the plaintiff argues that this does not take into consideration unpaid holidays and other occasions where the plaintiff was unable to work five days a week, and the plaintiff charges that the ALJ "failed to explore the issue with a detailed summary earnings query. . . ." [Id.]

However, a detailed summary of FICA earnings is already in the record.  This summary also includes reported non-FICA earnings as well.  This summary indicates that the maximum amount earned by the plaintiff at the Fontana School District was $3,203.06 in 1998. [AR 46, 48].  It is unknown whether these earnings represent an entire calendar year or a shorter school year.  Even if the latter, it is clear that, if the plaintiff's monthly earnings exceeded $300.00, it was by very little.  Earnings between $300.00 and $500.00 may or may not be substantial gainful activity depending upon "other information."  20 C.F.R. § 416.974(b)(6).

Therefore, on remand further inquiry and a determination whether this job as a cafeteria worker constitutes past relevant work is also required.  **The opinion of Dr. Douglas Ballaine**

_____The opinion of a treating physician is generally entitled to greater weight than the opinions of non-treating physicians.  This is not to say, however, that the opinion of even a treating physician is "necessarily conclusive as to either a physical condition or the ultimate issue of disability." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989), citing Rodriguez v. Bowen, 876 F.2d 759, 761-62 & n. 7 (9th Cir. 1989).  If, for example, the opinion of a treating physician is rejected in favor of that of a non-treating physician, and the opinion of the non-treating physician is based upon

independent clinical findings, the opinion of the non-treating physician can constitute substantial evidence.  It is then for the ALJ to resolve the conflict.  <u>Andrews</u>, 53 F. 3d at 1041.  If, on the other hand, the opinion of the non-treating physician is based upon the same clinical findings considered by the treating physician, the ALJ must cite specific and legitimate reasons for rejecting the treating physician's opinion.  <u>Id</u>.

Beginning on March 1, 2002, the plaintiff began to see Douglas Ballaine, D.O. [AR 220.] Dr. Ballaine prescribed a number of medications, including MS Contin and Roxanal.[7] [AR 225-26.] Dr. Ballaine or his associate also referred the plaintiff to a psychiatrist. [AR 222, 224.]

In May, 2002, Dr. Ballaine wrote a brief report indicating that in his opinion, the plaintiff was "presently 100% disabled and will continue to be for more that [sic] one year." [AR 220.] The plaintiff contends that the ALJ improperly rejected Dr. Ballaine's opinion and that Dr. Ballaine's opinions should be credited as true.  [Joint Stipulation at 17.]

The ALJ rejected Dr. Ballaine's opinion because the opinion that the plaintiff was one hundred per cent disabled was "egregiously accommodative and completely unsupported by the mild objective findings, which devoid [sic] of any indication of significant medical complications resulting from the claimant's musculoskeletal condition." [AR 17.]

---

[7]Controlled release morphine sulphate used for moderate to severe pain "intended for use in patients who require repeated dosing with potent opioid analgesics over periods of more than a few days." <u>Physicians Desk Reference</u>, 2005 WL 1158625 (PDR).  Roxanol is also morphine sulphate, but it is an immediate release medication for severe acute or severe chronic pain.  Http://www.rxlist.com.

The defendant argues that substantial evidence supports the ALJ's conclusion that Dr. Ballaine's opinion was unsupported, citing the relatively benign MRI findings, Dr. Meltzer's examination, Dr. Green's evaluation, and the opinions of the State agency physician.  The plaintiff, however, argues that because Dr. Ballaine believed that the plaintiff had a neurological disorder, the absence of findings in the examinations of Dr. Meltzer, an orthopedist, did not detract from Dr. Ballaine's opinion.

However, both Dr. Green and Dr. Meltzer conducted a limited neurological examination.  Where Dr. Ballaine found hyperreflexia and clinical muscle weakness in all extremities [AR 220], Dr. Green found normal reflexes throughout [AR 145] and normal muscle strength in the upper and lower extremities [AR 148].  Dr. Meltzer found deep tendon reflexes to be normal and equal in all extremities, but he found that the results of the plaintiff's motor function examination were "totally unreliable," referring to the plaintiff's lack of cooperation in squeezing the Jamar dynamometer. [AR 175.]

The plaintiff counters that "[t]he most obvious explanation of the difference between Dr. Ballaine in May 2002 and Dr. Green in April 2000 is that Marcy Jackson's condition changed." [Joint Stipulation at 16.]  However, in view of the intervening report of Dr. Meltzer five months before the plaintiff began to see Dr. Ballaine, the plaintiff's present claims of a deteriorated condition is not as obvious as the plaintiff suggests.

This being said, however, the ALJ's reasons for rejecting Dr. Ballaine's opinion, nevertheless, is not sufficiently specific and legitimate.

\\\

1    First, the ALJ's conclusion that Dr. Ballaine's opinion was
2    unsupported by "mild objective findings" is a conclusion not based
3    upon substantial evidence at least from the time the plaintiff began
4    to see Dr. Ballaine.  Dr. Ballaine indicated that the plaintiff had
5    "generalized Hypereflexia [sic] associated with clinical muscle
6    weakness in all extremities." [AR 220.] Dr. Ballaine further noted
7    that "the muscle tone in all extremities is accentuated. . . ."  Dr.
8    Ballaine's differential diagnoses included multiple sclerosis, lupus
9    and A.L.S.  Dr. Ballaine further reported that "[l]ab findings are
10   remarkable for possible Lupus." [AR 220.]  These findings, coupled
11   with Dr. Ballaine's prescription of morphine-based analgesics, do not
12   suggest that the plaintiff's findings, at least at the time of Dr.
13   Ballaine's examination, were "mild" as found by the ALJ.  Although the
14   findings of Dr. Meltzer contradict Dr. Ballaine's findings, several
15   months had elapsed between Dr. Meltzer's report and Dr. Ballaine's
16   report.  This being the case, the ALJ's conclusion that Dr. Ballaine's
17   report was "egregiously accommodating" is speculative. "'The
18   [Commissioner] may not assume that doctors routinely lie in order to
19   help their patients collect disability benefits.'" Lester v. Chater,
20   81 F.3d 821, 832 (9th Cir. 1996), quoting Ratto v. Secretary, 839
21   F.Supp. 1415, 1426 (D.Or. 1993).

22   The plaintiff urges this court to credit Dr. Ballaine's opinion
23   as true and argues that the matter should be remanded solely to
24   determine "when the severe pain condition described by Dr. Ballaine
25   arose." [Joint Stipulation at 17.]  However, Dr. Ballaine's opinion
26   that the plaintiff is "100% disabled" is not a medical opinion but an
27   opinion on an issue reserved to the Commissioner.  20 C.F.R. §
28   416.927(e).

1    Moreover, the ALJ's opinions concerning Dr. Ballaine's report are
2    speculative precisely because there is no supportive documentation
3    that Dr. Ballaine was "egregiously accommodating."  There is likewise
4    no supportive documentation as to the severity and the persistence of
5    the findings reported by Dr. Ballaine.  Dr. Ballaine contends that
6    there are supportive laboratory findings, yet no laboratory results
7    have been submitted.  Dr. Ballaine reports that there is clinical
8    muscle weakness, but no qualitative findings are reported.  Dr.
9    Ballaine indicated in May, 2002, that he referred the plaintiff for a
10   neurological examination and that brain MRI results are pending, yet
11   seven months later, no such evidence was submitted to the ALJ.  In
12   fact, except for multiple prescriptions documenting the use of
13   morphine, Tylenol with codeine, and other medications, no treatment
14   record from Dr. Ballaine or his associates was submitted by the
15   plaintiff either at the time of the hearing, before the Appeals
16   Council or before this court. See Thomas v. Barnhart, 278 F.3d 947,
17   957 (9th Cir. 2002)(The opinion of even a treating physician may be
18   discounted if the opinion "is brief, conclusory, and inadequately
19   supported by clinical findings").

20   On the other hand, Dr. Ballaine's report suggested the presence
21   of a significant disease process not previously explored, and the
22   record is inadequate to make a determination for the entire period at
23   issue.  Rather than jumping to a conclusion that Dr. Ballaine was
24   "egregiously accommodating," the ALJ should have more fully developed
25   the record by obtaining the treatment records and/or obtaining an
26   updated consultative examination, preferably one by a neurologist.
27   Tonapetyan, 242 F.3d at 1150 (9th Cir. 2001); Tidwell v. Apfel, 161
28   F.3d 599, 602 (9th Cir. 1999)("In Smolen v. Chater, 80 F.3d 1273, 1288

(9th Cir. 1996), this court held that if the ALJ needs to know the basis of the doctor's opinion, he has a duty to conduct an appropriate inquiry").

Once these records have been obtained, then "[t]here may be evidence in the record to which the Secretary can point to provide the requisite specific and legitimate reasons for disregarding the testimony of [the plaintiff's] treating physician. Then again, there may not be. In any event, the [Commissioner] is in a better position than this court to perform this task." McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).

Accordingly, this matter requires remand for further development of the record.

Upon remand, the ALJ should obtain the updated records of Cornerstone Medical Group, including the records of Dr. Archie Mays, Dr. Selwyn Patrick, Dr. David Fisher, and Dr. Guy Gottschalk [AR 62, 125]; the records from Kaiser Permanente [AR 94, 167]; and more particularly the records of Dr. Ballaine.

Additionally, the record suggests that the plaintiff has been receiving treatment from Ujima Counseling Center. [AR 222.] The records should be obtained.

If the ALJ deems it necessary, he should obtain updated consultative examinations, preferably from a neurologist, and, if necessary, obtain an updated psychiatric or psychological consultative report. [AR 222.]   The consultative examiners should be provided copies of the medical evidence of record.

Upon receipt of the updated records, the ALJ should reassess the plaintiff's residual functional capacity.

\\\

A vocational expert should be called to testify. Even if the ALJ again finds that the plaintiff's mental impairment is non-severe, he should outline the restrictions that are attributable to the plaintiff's mental impairment in any hypothetical questions to the vocational expert.

The ALJ should also make a determination as to whether the plaintiff's past work as a cafeteria worker qualifies as past relevant work.

Likewise, the plaintiff's work as a security guard at an auto auction should also be addressed. [AR 72, 76; AR 48.]

**ORDER OF REMAND**

The Court has reviewed the pleadings, Joint Stipulation of the parties, and the transcript of the record.  In accordance with the foregoing discussion, the magistrate judge finds that good cause has been shown for remanding the case to the Commissioner.

IT IS ORDERED that this case be remanded to the Commissioner of the Social Security Administration pursuant to sentence four of 42 U.S.C. section 405(g) for further administrative proceedings consistent with the reasons set forth herein.

Dated: November 30, 2005


_____/s/_____
JAMES W. McMAHON
United States Magistrate Judge